IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ALICIA TAYSE, | ) | CASE NO. 1:25-CV-01936-BYP |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE BENITA Y. PEARSON |
| vs. | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| | ) | |

Plaintiff, Alicia Tayse ("Plaintiff" or "Tayse"), challenges the final decision of Defendant, Frank Bisignano[1], Commissioner of Social Security ("Commissioner"), denying her applications for Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

## I. PROCEDURAL HISTORY

In March 2023, Tayse filed an application for POD and DIB, alleging a disability onset date of May 30, 2023, and claiming she was disabled due to Rheumatoid arthritis, gastroparesis, insulin dependent diabetes mellitus, anemia, sleep apnea, depression and anxiety. (Transcript ("Tr.") 143, 154, 155.) The

[1] On May 7, 2025, Frank Bisignano became the Commissioner of Social Security.

applications were denied initially and upon reconsideration, and Tayse requested a hearing before an administrative law judge ("ALJ"). (*Id*. at 171, 177, 181.)

On July 25, 2024, an ALJ held a hearing, during which Tayse, represented by counsel, and an impartial vocational expert ("VE") testified. (*Id*. at 118-142.) On August 12, 2024, the ALJ issued a written decision finding Tayse was not disabled. (*Id*. at 89-113.) The ALJ's decision became final on July 16, 2025, when the Appeals Council declined further review. (*Id*. at 1.)

On September 12, 2025, Tayse filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 7, 9.) Tayse asserts the following assignments of error:

1. Whether the Administrative Judge's Decision is Supported by Substantial Evidence When He Did Not Properly Evaluate Plaintiff's Allegations Pursuant Law [sic] to SSR 16-3p.

2. Whether New and Material Evidence Warrants Remand.

(Doc. No. 7 at 1.)

## II. EVIDENCE

### A. Personal and Vocational Evidence

Tayse was born in 1983 and was 41 years-old at the time of her administrative hearing (tr. 122), making her a "younger" person under Social Security regulations. *See* 20 C.F.R. §§ 404.1563(c), 416.963(c). She has at least a high school education. (Tr. 112.) She has past relevant work as a medical assistant. (*Id*.)

## B. Relevant Medical Evidence[2]

On April 27, 2023, Tayse presented for a consultation with rheumatologist Dr. Peugh. (*Id*. at 650.) Tayse complained of three months of pain, swelling, 60-minutes of morning stiffness, numbness and tingling in the tips of her fingers, chronic pain in her shoulders and neck and hips, and pain in the left foot due to hammertoes. (*Id*. at 651.) Dr. Peugh noted rheumatologic symptoms including chronic night sweats, dry mouth, livedo rash on hands and arms, and difficulty swallowing pills. (*Id*.) Diagnoses at this visit included seronegative rheumatoid arthritis, immunosuppression, hammer toe of left foot, scarring alopecia, livedo reticularis, tachycardia, and dyspnea on exertion. (*Id*. at 657.) X-rays showed no erosions. (*Id*.) Dr. Peugh considered medication options considering nausea and history of gastric bypass. (*Id*.)

Tayse followed up with Dr. Peugh on June 1, 2023. (*Id*. at 608.) She reported taking methotrexate by injection once per week and thought it helped at the beginning but is now not sure. (*Id*.) She reported stopping other medications and having worsening numbness and tingling throughout her body, but worse in her legs and feet. (*Id*. at 609.) She reported worsening anxiety, depression, and fatigue symptoms. (*Id*.) She stopped taking gabapentin and ropinirole and experienced worsening numbness and tingling in her hands and feet. (*Id*.) X-rays of her chest and hands were normal. (*Id*.) Physical exam revealed normal range of motion, no deformities, no swelling, and no tenderness in the hands, wrists, elbows, shoulders, spine, hips, knees, ankles, and feet, except for some tenderness in the elbows, wrists, and knee. (*Id*. at 612.) Dr. Peugh's plan included continuing methotrexate injections, and considering initiation of adalimumab in one to two months if no improvement on methotrexate. (*Id*. at 615.)

On July 18, 2023, Tayse followed up with the Cleveland Clinic Sleep Disorders Center. (*Id*. at 574.) She reported significant leg pain despite three rounds of IV iron infusions. (*Id*.) Diagnoses included

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

excessive daytime sleepiness and restless leg syndrome. (*Id*. at 579.) She was encouraged to frequently use her CPAP machine to try to increase her total sleep time from 6-7 hours to 7-9 hours. (*Id*.)

On July 20, 2023, Tayse presented for a virtual follow up visit. (*Id*. at 569.) She reported significant brain fog, narcolepsy making her feel exhausted during the day, and significant pain in her hands, wrists, and knees. (*Id*.) Physical exam revealed she appeared alert and appropriate, in no distress, well-hydrated and nourished, and happy, smiling, and interactive, with normal breathing and no overt edema. (*Id*. at 571.) Diagnoses at this time included Type 1 Diabetes, controlled, brain fog secondary to pain and narcolepsy, epigastric pain, narcolepsy due to underlying condition, depression, and gastroparesis that is not always controlled. (*Id*. at 572.)

Tayse followed up with her rheumatologist on September 15, 2023. (*Id*. at 1214.) She reported significantly decreased swelling in her hands but still has pain. (*Id*.) Her hands and wrists hurt all the time. (*Id*.) In the morning, she has stiffness lasting 15 minutes and numbness in her hands. (*Id*.) Physical exam was normal, including normal range of motion, no deformities, no swelling, no tenderness in the hands, shoulders, spine, hips, knees, ankles, tenderness in the right elbow and wrist, no more swelling of joints and significantly improved tenderness. (*Id*. at 1218.)

On October 4, 2023, Tayse presented with abdominal pain. (*Id*. at 470.) Physical exam was unremarkable, including alert, oriented, no acute distress, no joint swelling or effusion, no cyanosis, clubbing, or edema, mood appropriate, and not depressed. (*Id*. at 475.) She was assessed with gastroparesis, bloating, dyspepsia, weight gain, vitamin D deficiency, GERD, and stress. (*Id*.) The provider prescribed medication and referred to bariatric surgery due to gaining weight back after the initial bariatric surgery. (*Id*.)

On October 9, 2023, Tayse presented for a telephonic follow up appointment for excessive daytime sleepiness and restless leg syndrome. (*Id*. at 468.) The provider noted her history of obstructive sleep apnea

and use of a CPAP. (*Id*. at 469.) The provider opined her sleepiness is likely multifactorial and encouraged her to increase her total sleep time and more frequent CPAP usage. (*Id*.) Her medications were increased and the provider recommended nonmedical therapy for restless leg syndrome, like cold/warm compresses. (*Id*.)

On October 27, 2023, Tayse attended a virtual follow up appointment. (*Id*. at 440.) She reported significant pain, feeling tired, frustration regarding weight gain, and frustration with experiencing many illnesses. (*Id*.) The provider assessed good control of her type 1 diabetes over the past year, brain fog secondary to chronic pain and sleep disorders, rheumatoid arthritis with pain better controlled, bloating secondary to gastroparesis, depression, and controlled hypertension. (*Id*. at 443.)

On January 8, 2024, Tayse presented for a psychological evaluation. (*Id*. at 1336.) She reported rheumatoid arthritis, gastroparesis, type one diabetes, anemia, sleep apnea, joint pain in hands and ankles, poor appetite, frequent bathroom breaks, and poor sleep. (*Id*. at 1337.) She has chronic pain and fatigue and restless leg syndrome. (*Id*.) She has worked for Cleveland Clinic as a medical assistant for the past seventeen years. (*Id*. at 1338.) She reported keeping up with the pace of work "but it's exhausting." (*Id*.) She always followed supervisors' direction and lamented that her supervisors never understood or supported her medical problems. (*Id*.) Her coworkers were supportive and helped her considerably. (Id.) She has a driver's license and will drive her son's vehicle. (*Id*.) She does not have a social life but likes to color and build Legos, although it is difficult now due to pain in her hands. (*Id*.) She manages her finances. (*Id*.) She bathes independently. (*Id*.) She cooks, cleans, does laundry, and reported no help from her husband or son. (*Id*.) She has a hard time vacuuming, hanging up shirts, and she cannot scrub. (*Id*.) She has a hard time sleeping and vomits often. (*Id*.) She walked to the examination room with an unremarkable gait and no assistive devices. (*Id*. at 1337.) When she got up to leave, she moved stiffly. (*Id*. at 1339.) She was diagnosed with

major depression, depressive disorder due to another medical condition, and generalized anxiety disorder. (*Id*. at 1340.)

On January 10, 2024, Tayse presented with complaints of nausea, vomiting, and diarrhea. (*Id*. at 395.) Physical exam was normal. (*Id*. at 398.) She was prescribed a medication, advised to hydrate, discontinue dairy products because they are hard to digest, and consider a BRAT diet. (*Id*.)

On January 18, 2024, Tayse presented for a virtual follow up visit due to nausea and vomiting. (*Id*. at 383.) Physical exam was unremarkable. (*Id*. at 385.) She reported improvement in symptoms and was advised to continue the treatment plan. (*Id*. at 386.)

On January 30, 2024, Tayse presented for a virtual visit with Dr. Flannery for evaluation of pharmacogenomic testing to guide dosing and/or selection of vitamins, minerals, and weight loss medications. (*Id*. at 367-70.) Tayse elected to proceed with testing. (*Id*. at 370.)

On January 25, 2024, Tayse presented for a follow up visit with Dr. Peugh. (*Id*. at 375.) She reported feeling better with the proper dose of methotrexate and Humira. (*Id*.) She noted a 70 percent improvement from when she was diagnosed, but still experiences pain, swelling, and stiffness in her second and third fingers bilaterally, and pain in her right forearm. (*Id*.) Her methotrexate dose was increased in hopes of reaching remission, and another medication was prescribed. (*Id*. at 381.)

On February 12, 2024, Tayse presented for a follow up visit. (*Id*. at 358.) The provider noted she has morbid obesity, and Type 1 Diabetes with severe insulin resistance. (*Id*.) The provider recommended gastric bypass distalization which would result in weight loss and provide a good change for improving her insulin resistance. (*Id*.)

On February 23, 2024, Tayse presented for an acupuncture appointment to treat the neck and back pain she has experiences for the past six years. (*Id*. at 1398.) She reported experiencing neck and back pain relief following her last acupuncture treatment. (*Id*.)

On February 28, 2024, Tayse presented for physical therapy to treat hip pain that limited bending, physical activities, driving, dressing, sleeping, sitting, rising from a chair, walking, stair negotiation, cleaning, and cooking. (*Id*. at 1362.) She had 4/5 strength in her hips, 4/5 strength in her knees, slightly limited range of motion in her lumbar spine, and an antalgic gait. (*Id*. at 1364-65.) Tayse was provided exercises. (*Id*. at 1365.)

On January 30, 2025, Tayse presented for a rheumatology follow up visit. (*Id*. at 46.) She reported pain on her right side, especially in her hand at night, and in her forearm and shoulder. (*Id*.) Her medications are somewhat effective but appear to wear off after three to four days. (*Id*.) She rated her pain at a 6. (*Id*. at 48.) Her medications were adjusted. (*Id*. at 57.)

On February 17, 2025, Tayse presented for a virtual follow up visit. (*Id*. at 60.) She reported Humira providing only two days of relief before experiencing significant pain again. (*Id*.) She reported limited mobility and feelings of misery due to her condition. (*Id*.) She also reported frustration and emotional distress related to delayed revision surgery due to a provider deeming her "mentally unstable" even though both her psychiatrist and psychologist cleared her for surgery. (*Id*.) Diagnoses include obesity, moderate episode of recurrent major depressive disorder, fibromyalgia, and rheumatoid arthritis. (*Id*. at 63-4.)

On July 8, 2025, Tayse presented for a consult regarding bilateral carpal tunnel syndrome. (*Id*. at 13.) She initially attributed symptoms to her rheumatoid arthritis. (*Id*.) Imaging revealed no erosions or evidence of inflammatory arthritis, mild first carpometacarpal osteoarthrosis bilaterally, and atherosclerotic vascular calcifications bilaterally. (*Id*. at 21.) Following EMG studies, she was diagnosed with severe carpal tunnel on the left and mild to moderate on the right. (*Id*. at 28.) The provider administered a corticosteroid injection into the left wrist and recommended a wrist brace. (*Id*.)

On March 27, 2025, Tayse presented for physical therapy due to shoulder pain that interferes with physical activities. (*Id*. at 72.)

On April 16, 2025, Tayse presented to a sports health physician regarding her chronic shoulder pain. (*Id*. at 77.) She was diagnosed with bilateral rotator cuff tendinosis and right shoulder adhesive capsulitis. (*Id*. at 78.) The provider discussed using ice and acetaminophen, continuing physical therapy, and consider a brisement procedure or steroid injection. (*Id*.)

On May 27, 2025, Tayse presented for a follow up physical therapy appointment. (*Id*. at 35.) The provider noted she made progress toward her goals but still experiences impairments in activities of daily living. (*Id*.)

## C. State Agency Reports

### 1. Mental Impairments

On September 20, 2023, Ann Lovko, Ph.D., reviewed the file and opined Tayse was moderately limited in her ability to maintain attention and concentration for extended periods, ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, ability to interact with the general public, and ability to respond appropriately to changes in the work setting. (Tr. 151.) Dr. Lovko found Tayse not significantly limited in all other limitation areas. (Id.) Dr. Lovko opined Tayse has the "mental capacity to perform complex/detailed (3-4) step tasks. She can relate adequately on a superficial basis in an environment that entails infrequent public contact and minimal interaction with coworkers/supervisors. She can adapt to a setting in which duties are routine and predictable and in which changes are infrequent." (Id. at 152.)

On January 15, 2024, on reconsideration, Courtney Zeune, Psy.D., affirmed Dr. Lovko's findings.

### 2. Physical Impairments

On September 15, 2023, Mehr Siddiqui, M.D. reviewed the claim file and opined Tayse could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, unlimited in her ability

to push and pull in both upper and lower extremities, stand and/or walk about six hours in an eight hour work day, sit about six hours in an eight hour work day, never climb ladders, ropes, or scaffolds, frequently balance, and occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl. (Id. at 149.) Dr. Siddiqui found Tayse had no manipulative, visual, communicative, or environmental limitations. (Id. at 150.) Dr. Siddiqui opined Tayse is capable of light work with postural limitations. (Id. at 152.)

On January 18, 2024, on reconsideration, Abraham Mikalov, M.D. affirmed Dr. Siddiqui's findings.

**D. Hearing Testimony**

During the July 25, 2024 hearing, Tayse testified to the following:

• She is married, has a valid driver's license, is 5'2'' and weighs 227 pounds. (*Id*. at 123.) She is currently on long-term leave from her job working as a medical assistant. (*Id*.) She held her job from 2007 to 2023. (*Id*.) Her leave ends in April 2024. (*Id*.) Towards the end of her employment it was hard for her to clean the rooms and open doors for patients. (*Id*. at 131.) "They said my mood wasn't safe to be around people" so they helped her with paperwork to be off work. (*Id*. at 131-32.) Before she went on medical leave, she would leave early every once in a while, due to her medical problems but never called off work. (*Id*. at 132.)

• Her hands are "very bad". (*Id*. at 124.) It is hard for her to write and grasp. (*Id*.) Her shoulders are very painful. (*Id*.) It is hard to use her right arm, and she cannot reach. (*Id*.) When sitting for long periods of time her legs hurt. (*Id*.) It is hard to get in and out of the car. (*Id*.) Walking is "really hard." (*Id*.) She estimates she could walk for about five minutes. (*Id*. at 125.) After five minutes her foot would start burning and hurting. (*Id*.) She thinks she could lift less than five pounds. (*Id*.) She can carry a grocery bag but nothing more than that. (*Id*.) Rheumatoid arthritis affects her hips, legs, feet, and shoulders. (*Id*. at 128.) She cannot put her shoes on because she can't lift her right leg. (*Id*.) Doctors are evaluating for fibromyalgia. (*Id*.)

• She has problems concentrating and making decisions. (*Id*. at 125.) She has problems getting along with others and stays home all the time. (*Id*. at 125-26.) She currently sees a psychiatrist, psychologist, and a bariatric psychiatrist. (*Id*. at 126.) Treatment is "going ok." (*Id*.) She takes medications as prescribed. (*Id*.) She feels "very tired" from the medications, sleeps a lot throughout the day, and feels weak and exhausted. (*Id*.) The Methotrexate medication is an injection and is no longer helping her hands. (*Id*. at 129.) It makes her feel tired and sore. (*Id*.) She takes Humira, another injection, every other week and that "takes the edge off." (*Id*.) She takes Neurontin when her legs hurt. (*Id*. at 130.) She tried to reposition herself to relieve pain. (*Id*.) She cannot take over the counter pain medications due to her "stomach and because of the bypass." (*Id*.) She has gastroparesis which makes her stomach hurt and causes her to have diarrhea about four to five times per day. (*Id*. at 131.)

• On a typical day she sits on the couch, will walk around a little bit, then sit back on the couch. (*Id*. at 126.) She does laundry and cooks simple meals. (*Id*. at 127.) Doing laundry is hard for her because she has to reach, and the clothes get heavy. (*Id*. at 132.) Vacuuming is hard for her. (*Id*. at 127.) Her adult son lives with her and her husband and will clean the bathroom because she cannot scrub. (*Id*.) She does not have any pets or any hobbies. (*Id*. at 128.) She has always been a hard worker and if she could work, she would but she is always in pain. (*Id*.)

The VE testified Tayse had past work as a medical assistant. (*Id*. at 134.) The ALJ then posed the following hypothetical question:

> Please assume a hypothetical individual of the claimant's age and education with the past job described. Further assume that the individual is limited to the full range of light with the following additional limitation. Handling, finger and feeling, all bilateral, all limited to frequent. Climbing ramps and stairs is limited to occasional. Climbing ladders, ropes or scaffolding is limiting to never. Balancing is limited to frequent. Stooping, kneeling, crouching and crawling are all limited to occasional. The hypothetical individual is able to perform simple, routine tasks. The hypothetical individual is limited to occasional interaction with supervisors and occasional and superficial interaction with co-workers and the public. The hypothetical individual is able to make simple, work-related decisions. Superficial is further defined as doing no tasks involving arbitration, negotiation, confrontation, correcting the work of others, persuading others or being responsible for the safety or welfare of others. Can the hypothetical individual perform any of the past work you described?

(*Id*. at 134-35.)

The VE testified the hypothetical individual would not be able to perform Tayse's past work as a medical assistant. (*Id*. at 135.) The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as housekeeping/cleaner, small products assembler I/bench assembler, and cashier II. (*Id*.) The ALJ asked a second hypothetical:

> I have the second hypothetical and in the second hypothetical, please assume an individual that is off-task in addition to normal breaks, more than 15 percent of the time in an eight-hour workday or absence from work two days per month or more. Can that hypothetical individual perform any work?

(*Id*.) The VE responded:

> Generally speaking, there's no clean dividing line where work ceases in a competitive labor market. In fact, I would suggest it never entirely ceases. That said, turning our attention to off-task, in my opinion, it's not until we reach 20 percent off-task consistently and 20 percent is an hour and a half. It's at that point where I do think that essentially, essentially meaning in large enough numbers, there's no work in the entire competitive labor market. Below that, there is erosion in the employment base. The amount of erosion 11 depend upon the occupation, the setting and the time off-task. So for example, cleaner occupations or office occupations tend to be more amenable to that off-task time. And I don't think that they erode entirely until you reach that 20 percent. Manufacturing occupations, on the other hand, especially those on a production line typically erode more quickly, just generally speaking. And I think it's reasonable to expect that they would erode entirely at that 15 percent that you mentioned. So the small parts assembler I would fit into that 15 percent.

(*Id*. at 135-36.) The VE went on to address absenteeism, explaining:

> So unlike off-task, there's quite a bit of evidence in the professional literature concerning absenteeism. It's been a significant issue for employers for quite a number of years, including pre-pandemic. It appears that it's not abating. In fact, it might be increasing, the issue might be increasing. There is good evidence to indicate that employers may be tolerating three days a month absences in relatively large numbers. My experience, conversely, has been that, while it's true there are some employers who will tolerate three days, however likely not in large numbers. So until there is additional empirical evidence to support otherwise, I maintain my cut-off at three and greater. It's at that point where I do think that essentially there's no work in the competitive labor market. So one and two, yes. Three, likely not.

(*Id*. at 136-37.) The ALJ asked a third hypothetical:

> I have a third hypothetical and the third hypothetical includes all of these same limitations we had in the first hypothetical. The only difference is this time we have sedentary instead of light. Can, well for the record, can the hypothetical individual perform any of the past work that you described?

(*Id*. at 137.) The VE responded, no. (Id.) The ALJ asked, "Can the hypothetical individual perform any other work?" (*Id*.) The VE responded, yes, cashier II, small products assembler I, and product sorter. (*Id*. at 137-38.) Tayse's attorney asked:

> Sticking with hypothetical number three, if we modify the handling, fingering and feeling bilaterally to an occasional basis, and if I ask you to

> include additionally that reaching in all directions with the right upper extremity is limited to an occasional basis, would that change your responses to the sedentary jobs?

(*Id*. at 138-39.) The VE responded that that would eliminate each of the sedentary occupations. (*Id*. at 139.) Tayse's counsel asked whether two additional unscheduled breaks would affect SVP: 2 jobs. (*Id*.) The VE testified that she didn't think it would be an issue. (*Id*.) After questioning by Tayse's counsel, the VE explained that leaving early is considered an "off-task" issue because it takes a person away from work, and if a person is doing that 20 percent on a regular basis, then eventually there is no work in the competitive labor market. (*Id*. at 140.)

## III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if the claimant: (1) had a disability; (2) was insured when the claimant became disabled; and (3) filed while the claimant was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that they are not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must show that they suffer from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c), 416.920(c). A

"severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent the claimant from doing their past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent the claimant from doing their past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Tayse was insured on the alleged disability onset date, May 30, 2023, and remains insured through December 31, 2028, the date last insured ("DLI"). (Tr. 91, 143.) Therefore, in order to be entitled to POD and DIB, Tayse must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2028.

2. The claimant has not engaged in substantial gainful activity since May 30, 2023, the alleged onset date (20 CFR 404.1571 et seq.).

3. The claimant has the following severe impairments: rheumatoid arthritis; obesity; peripheral neuropathy; depressive disorder; anxiety disorder; and post-traumatic stress disorder (PTSD) (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she can frequently handle, finger, and feel bilaterally; she can occasionally climb ramps or stairs, stoop, kneel, crouch, or crawl; she can never climb ladders, ropes, or scaffolds; she can frequently balance; she can operate a motor vehicle but can do no commercial driving; she can never work at unprotected heights or around moving mechanical parts; she can perform simple, routine tasks; she can have occasional interaction with supervisors, and she can have occasional and superficial interaction with coworkers and the public (where "superficial" means no tasks involving arbitration, negotiation, confrontation, directing the work of others, persuading others, or being responsible for the safety or welfare of others); and she can make simple work-related decisions.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on April 26, 1983, and was 40 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from May 30, 2023, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 91-113.)

## V. STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011).

Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs*., 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec*., 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec*., 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the

Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A. Symptom Evaluation.

In her first assignment of error, Tayse argues the ALJ failed to evaluate her symptoms pursuant to SSR 16-3p. (Doc. No. 7 at 11-17.) Tayse contends the ALJ failed to properly consider the entire case record and provide specific and valid reasons for finding Plaintiff's symptoms not consistent with the medical evidence. (*Id*. at 12.) Tayse claims the ALJ relies on a June 2022 examination record, which predates the alleged onset date. (*Id*. at 13.) Tayse argues the ALJ failed to consider the difficulty she has with activities of daily living, and did not make it clear why he does not find her subjective allegations as to activities of daily living consistent with the evidence. (*Id*. at 14.) Tayse contends the ALJ did not properly consider the location, duration, frequency, and intensity of her pain or other symptoms and the medication to treat same. (*Id*.) Tayse argues that persistent attempts to obtain relief, like changing medications and dosage and trying a variety of treatments are an indication that plaintiff's symptoms are intense or persistent. (*Id*. at 15.) Tayse

asserts the ALJ's decision is not supported by substantial evidence and lacks the specificity required by SSR 16-3p. (*Id*. at 15-17.)

In response, the Commissioner argues the ALJ properly considered Tayse's subjective complaints and concluded she could perform a range of sedentary work. (Doc. No. 9 at 5.) The Commissioner points out the ALJ considered Plaintiff's hearing testimony, statements to the agency, activities, and the objective medical evidence. (*Id*.) The Commissioner contends that while the ALJ did consider a June 2022 medical record, the ALJ also discussed examinations throughout 2023 and 2024. (*Id*. at 6.) The Commissioner notes the ALJ also considered the PAMFs of state agency physicians, and concluded Tayse has greater limitations than noted by the state agency physicians. (*Id*. at 7.) The Commissioner argues the ALJ also considered Tayse's treatment record, including acupuncture and physical therapy, medication she takes to alleviate symptoms, and her activities of daily living. (*Id*. at 7-9.) The Commissioner claims the ALJ's decision is supported by substantial evidence and should be affirmed solely because the state agency medical consultive opinions alone may constitute substantial evidence supporting an ALJ's decision. (*Id*. at 10.)

A two-step process is used to evaluate an individual's symptoms. (20 CFR § 404.1529(c)(3), 416.929(c)(3); *Soc. Sec. Ruling 16-3p Titles II & XVI: Evaluation of Symptoms in Disability Claims*, SSR 16-3P (S.S.A. Oct. 25, 2017), 2017 WL 5180304.) At step one, the ALJ determines whether the individual has a medically determinable impairment that could reasonably be expected to produce the individual's alleged symptoms. (*Id*.; SSR 16-3p, 2017 WL 5180304 at *3.) At step two, the ALJ evaluates the intensity, persistence, and limiting effects of the claimant's symptoms. (*Id*. at *4.) "[O]bjective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms . . . [an ALJ] must consider whether an individual's statements about the intensity, persistence, and limiting effects of his or her symptoms are consistent with the medical signs and laboratory findings of record." (*Id*. at *5.)

An ALJ may consider the following factors when evaluating the intensity, persistence, and limiting effects of a claimant's symptoms:

1. Daily activities;
2. The location, duration, frequency, and intensity of pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

(*Id*. at *7-8.) An ALJ is not required to analyze all seven factors. *Pettigrew v. Berryhill*, No. 1:17-CV-01118, 2018 WL 3104229, at *16 (N.D. Ohio June 4, 2018), *report and recommendation adopted,* No. 1:17CV1118, 2018 WL 3093696 (N.D. Ohio June 22, 2018), citing *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005).

In evaluating complaints of pain or other symptoms, an ALJ may properly consider the credibility of the claimant. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997), citing *Kirk v. Secretary of Health and Human Servs.,* 667 F.2d 524, 538 (6th Cir.1981), *cert. denied,* 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983). "[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Id*., citing *Villarreal v. Secretary of Health and Human Servs.,* 818 F.2d 461, 463 (6th Cir.1987). "Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Id*. citing *Beavers v. Secretary of Health, Educ. and Welfare,* 577 F.2d 383, 386–87 (6th Cir.1978).

"An ALJ's determination of subjective evidence receives great deference on review." *Jones v. Comm'r of Soc. Sec. Admin.*, No. 1:21-CV-01257-DAC, 2022 WL 3155823, at *16 (N.D. Ohio Aug. 8,

2022), citing *Ulman v. Comm'r of Soc. Sec.,* 693 F.3d 709, 714 (6th Cir. 2012). "Absent compelling reason, this Court may not disturb the ALJ's analysis of the claimant's subjective complaints or the conclusions drawn from them." *Id*., citing *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019). "As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess[.]" *Ulman*, 693 F.3d at 713-14.

Here, the ALJ analyzed Tayse's symptoms, devoting nearly four single spaced pages to her physical symptoms alone. (Tr. 101-105.) The ALJ wrote, in part:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision. As for the claimant's statements about the intensity, persistence, and limiting effects of the claimant's symptoms, they are not entirely consistent with the medical evidence of record as discussed below.
>
> The undersigned has considered other factors in assessing the claimant's complaints of pain and other symptoms, and how those factors affect the claimant's ability to work. These include the following: the claimant's daily activities; the nature of the symptoms; precipitating and aggravating factors; the medications and any side effects; and other treatment followed and measures used to relieve the symptoms (see 20 CFR 404.1529 and Social Security Ruling 16-3p). Where examination shows objective medical evidence of an underlying medical condition, it must be determined whether: (1) the objective evidence confirms the severity of the alleged pain arising from the condition; or (2) the objectively established medical condition is of such severity that it can reasonably be expected to produce the alleged disabling pain. The undersigned's interpretation of these guidelines is that the factors must be carefully considered, but that the claimant's allegations of pain and functional loss do not have to be accepted at face value in every case. Any other interpretation would mean that the filing of the application and related procedural papers would be determinative in nearly every case.
>
> In this case, although the medical evidence documented the existence of impairments that could reasonably be expected to produce a certain degree of symptoms, the pivotal question is not whether such symptoms exist, but whether those symptoms occur with such frequency, duration, or severity

as to reduce the claimant's residual functional capacity or to preclude all work activity on a continuing and regular basis. Bearing this in mind, the undersigned finds that restricting the claimant to performing the range of work described above adequately addresses the location, duration, frequency, and intensity of the claimant's alleged symptoms as well as precipitating and aggravating factors. The claimant's testimony and allegations are not entirely consistent with the record as a whole.

*Medical Evidence of Physical Impairments*

The record supports that the claimant has experienced functional limitations related to rheumatoid arthritis, obesity, and peripheral neuropathy. The record supports height, weight, and body mass index ("BMI") scores consistent with the diagnosis of obesity (see e.g., BMI of 36.02 (2F/297 (07/05/22)); BMI of 40.24 (1F/118 (10/09/23)); BMI of 41.69 (1F/30 (01/25/24))).

The claimant's other remarkable examination findings and reports include the following: in June of 2022, the claimant reported bilateral wrist pain, but her imaging was unremarkable. On examination, she had full range of motion in her spine; she had no peripheral neuropathy in her upper or lower extremities; her gait and balance were normal; but she had tenderness in the right and left wrists worse on the right, though she had normal sensation, circulation, motor function, and joint mobility otherwise. Her provider recommended surgery for the right wrist (2F/317-319 (06/14/22)), which she underwent in July of 2022 (2F/289-292 (07/08/22)). A few weeks after surgery, she reported relief in her pain level (2F/278 (07/19/22)). She also did some occupational therapy to rehabilitate the wrist (e.g., 2F/289-289 (07/12/22); 2F/275-278 (07/19/22)). In September of 2022, she reported worsening neuropathic pain in her feet. She was provided pain medication and referred for further testing (2F/233-236 (09/23/22)). At an examination in October, her extremities were normal, she had normal range of motion and muscle strength, her sensation was grossly intact, and her gait was normal (2F/221-224 (10/21/22)).

She had a consultation with vascular medicine in March of 2023 related to leg pain and swelling. On examination, her pulses were normal bilaterally; she had few scattered varicose and reticular veins and a patch of venous telangiectasias; but she had no pitting edema. Her provider recommended support hose and further testing (2F/137-141 03/31/23)). At a follow up with her primary provider a few weeks later, she reported chronic leg and hand pain, and on examination, her hands had a reticular lacy pattern vascular on dorsum and pain with palpation at the wrists and metacarpophalangeal joints. She was referred to rheumatology (2F/130-132 (04/11/23)). At the rheumatology consultation later that month, she had a livedo rash on her hands and forearms bilaterally, multiple boutonniere

deformities bilaterally, and tenderness in her elbows, wrists, cervical and lumbar spines, ankles, and feet. Her lab results also indicated an autoimmune disease (see 3F/18). She was assessed with rheumatoid arthritis, and she was provided information regarding possible medications for treatment (2F/115-124 (04/27/23)). At a follow-up rheumatology visit in June of 2023, the claimant was tolerating injection medication once each week and reported some improvement; however, the claimant also stopped taking her pain medication and reported worsening numbness tingling in her hands and feet. On examination, she had normal range of motion, no swelling, and no tenderness in her back, shoulders, hips, or left knee, and she had less swelling and tenderness in her elbows, wrists, hands, right knee, and feet (2F/73-81 (06/01/23)). Her podiatric examination that month showed 5/5 muscle strength in her feet, and the podiatrist recommended supportive footwear to alleviate pain and paresthesia (2F/64-68 (06/19/23)). At a follow-up with her primary care provider in July of 2023, she reported abdominal pain, fatigue, and pain in her wrists, hands, and knees. Her provider prescribed a muscle relaxant (2F/34-37 (07/20/23)). In September, she reported a significant decrease in swelling in her hands, but she still had pain in her hands, wrists, and feet (4F/12-20 (09/15/23)). She reported that her rheumatoid arthritis pain was under better control in October of 2023 (1F/91-94 (10/27/23)). At a consultative psychological examination in January of 2024, she walked into the examination room with an unremarkable gait and without any assistive devices; however, when she got up to leave, she moved stiffly (6F/2, 4 (01/08/24)). A physical examination a few weeks later was unremarkable (1F/34-37 (01/18/24)). At the end of the month, she noted about 70% improvement in her symptoms at her rheumatology follow-up. She still had tenderness in her wrists and hands, but her other tenderness and swelling improved from her prior visit. Her medication was adjusted in the hopes of reaching remission (1F/26-33 (01/25/24)).

The record reflects that the claimant had a consultation with an acupuncture clinic on February 16, 2024. At the exam, she had tenderness, pain to palpation, limited range of motion, and tightness in her back, neck, fingers, and knees; her gait was slow; and she had edema in the fingers and knees. She received treatment that day (7F/67-74 (02/16/24)). At an appointment the following week, she reported having back spasms after the last appointment, but her neck and back pain were relieved (7F/56-58 (02/23/24)). She also underwent a physical therapy evaluation in that month, where she had tenderness and slightly reduced strength (4/5) in her hips bilaterally; she had slightly limited range of motion in her lumbar spine; she had slightly reduced strength in her knees (4/5); and her gait was antalgic with a lateral lean (7F/20-24 (02/28/24)).

Aside from intermittent findings related to pain and swelling, the claimant's exam findings of record generally show improvement in the claimant's

> symptoms with treatment, and they demonstrate that the claimant's physical functioning is largely intact. In sum, this evidence supports physical functional limitations, but not to the extent alleged.

(*Id*. at 102-105.) In his analysis, the ALJ wrote, in part:

> After careful consideration, the undersigned finds that the claimant's allegations are not entirely consistent with the evidence of record. The claimant has alleged disability from difficulty with lifting, walking, standing, sitting, squatting, bending, reaching, kneeling, climbing stairs, and using her hands. She has difficulty with joint pain and swelling. She also reported that she experiences burning in her legs. She also reported difficulty with memory, completing tasks, concentration, understanding, following instructions, and getting along with others. She does not handle stress or changes in routine well (Testimony; 4E/1-3; 5E/1-4; 6E; 9E).
>
> The claimant's allegations of disabling physical functional limitations are not entirely consistent with the evidence of record. The claimant has alleged difficulty with both exertional and non-exertional activities. However, the examinations of record do not support more disabling physical functional limitations than those set forth in the residual functional capacity finding. At an examination in June of 2022, she had full range of motion in her spine; she had no peripheral neuropathy in her upper or lower extremities; her gait and balance were normal; but she had tenderness in the right and left wrists worse on the right, though she had normal sensation, circulation, motor function, and joint mobility otherwise. She underwent right wrist surgery, which provided some relief along with therapy (2F/317-319 (06/14/22); 2F/289-292 (07/08/22); 2F/278 (07/19/22); 2F/289-289 (07/12/22); 2F/275-278 (07/19/22)). After receiving medication for worsening neuropathic pain in her feet (2F/233-236 (09/23/22)), her extremities were normal, she had normal range of motion and muscle strength, her sensation was grossly intact, and her gait was normal (2F/221-224 (10/21/22)). After being assessed with rheumatoid arthritis and starting treatment, she was tolerating injection medication once each week and reported some improvement; however, the claimant also stopped taking her pain medication and reported worsening numbness tingling in her hands and feet. On examination, she had normal range of motion, no swelling, and no tenderness in her back, shoulders, hips, or left knee, and she had less swelling and tenderness in her elbows, wrists, hands, right knee, and feet (2F/73-81 (06/01/23)). Her podiatric examination that month showed 5/5 muscle strength in her feet (2F/64-68 (06/19/23)). In September, she reported a significant decrease in swelling in her hands, but she still had pain in her hands, wrists, and feet (4F/12-20 (09/15/23)). She reported that her rheumatoid arthritis pain was under better control in October of 2023 (1F/91-94 (10/27/23)). At a consultative psychological examination in January of 2024, she walked into the examination room with an unremarkable gait and without any assistive

> devices; however, when she got up to leave, she moved stiffly (6F/2, 4 (01/08/24)). A physical examination a few weeks later was unremarkable (1F/34-37 (01/18/24)). At the end of the month, she noted about 70% improvement in her symptoms at her rheumatology follow-up. She still had tenderness in her wrists and hands, but her other tenderness and swelling improved from her prior visit. Her medication was adjusted in the hopes of reaching remission (1F/26-33 (01/25/24)). She underwent acupuncture therapy, which relieved her neck and back pain (7F/67-74 (02/16/24); 7F/56-58 (02/23/24)). She also underwent a physical therapy evaluation in that month, where she had tenderness and slightly reduced strength (4/5) in her hips bilaterally; she had slightly limited range of motion in her lumbar spine; she had slightly reduced strength in her knees (4/5); and her gait was antalgic with a lateral lean (7F/20-24 (02/28/24)). These findings support some limitations, but they are not entirely consistent with allegations of more disabling physical functional limitations than those set forth in the residual functional capacity finding. After reviewing the medical evidence of record available to them, including some of the above physical examination findings and imaging, the state agency medical consultants opined that the claimant is capable of light exertion with additional limitations on climbing and postural activities (1A/2-8; 3A/2-7). Even so, the residual functional capacity finding limits the claimant to sedentary exertion based on the combined effects of her impairments, which is consistent with the evidence, but not entirely consistent with allegations of more disabling physical limitations.
>
> In sum, the claimant's alleged physical functional limitations are not entirely consistent with the claimant's reported daily functioning, the examination findings of record, and the persuasive portions of the medical opinions. Nonetheless, the above evidence supports that the claimant has experienced the degree of limitation reflected in the residual functional capacity assessment above.

(*Id*. at 106-107.) The ALJ considered the objective medical evidence, including the location, duration, frequency, and intensity of pain and other symptoms, factors that aggravate symptoms, effectiveness and side effects of medication, and other treatment Tayse has received. Moreover, the ALJ considered her activities of daily living, including her ability to do laundry and prepare simple meals. (*Id*. at 102.) Ultimately, the ALJ discussed several of the seven factors set forth in SSR 16-3p for finding Tayse's impairments not as debilitating as she alleged. (*Id*. at 102-105.) Moreover, the ALJ relied on the PAMFs, and imposed an RFC that was more restrictive than the limitations recommended by that state agency

consultant's recommendations. (*Id*. at 109.) "There is ample case law concluding that State Agency medical consultative opinions may constitute substantial evidence supporting an ALJ's decision." *Maldonado o/b/o A.C. v. Kijakazi*, No. 4:20-CV-1878, 2022 WL 361038, at *6 (N.D. Ohio Jan. 14, 2022), *report and recommendation adopted sub nom. Maldonado o/b/o A.C. v. Comm'r of Soc. Sec.*, No. 4:20-CV-1878, 2022 WL 356557 (N.D. Ohio Feb. 7, 2022).

An ALJ must follow the two-step process for evaluating a claimant's symptoms and as part of that evaluation, an ALJ must consider whether the symptoms are consistent with the objective medical evidence and he did so here. SSR 16-3p, 2017 WL 5180304 at *5. Substantial evidence supports the ALJ's decision. See *Rogers,* 486 F.3d at 241. Given the high level of deference owed to an ALJ's findings with respect to the evaluation of a claimant's alleged symptoms and resulting limitations, under the circumstances presented herein, the court does not find the ALJ's symptom analysis was insufficient.

There is no error.

**B. Appeals Council Evidence.**

In her second assignment of error, Tayse argues the "new and material evidence" submitted to the Appeals Council warrants remand. (Doc. No. 7 at 17.) Tayse contends the evidence related to the impairments Plaintiff was suffering at the time of the hearing, and the evidence was not submitted at the time because the examinations occurred after the ALJ's decision. (*Id*. at 18.) Tayse maintains this evidence documents worsening symptoms which could have changed the outcome of the ALJ's decision. (*Id*.)

In response, the Commissioner argues the additional evidence submitted to the Appeals Council does not warrant remand. (Doc. No. 9 at 11.) The Commissioner contends remand under Sentence Six of 42 U.S.C. § 405(g) requires showing the evidence is new and material, and Tayse has not shown the evidence is material. (*Id*. at 11.) The Commissioner claims Tayse was diagnosed with carpal tunnel in July 2025, but the treatment note reveals she had a six-month history of bilateral carpal tunnel, which means symptoms

began five months before the ALJ's decision. (*Id*. at 11-12.) Given that symptoms were occurring months before the ALJ decision, the Commissioner maintains it is unlikely the ALJ's decision would have been different, especially because the ALJ included manipulative limitations in the RFC. (*Id*. at 12.) The Commissioner argues if Tayse's condition further deteriorated after the ALJ's decision, the remedy would be to file a new application. (*Id*.) The Commissioner notes case law supporting the fact that conservative treatment, like the physical therapy Tayse engaged for her shoulder, is unlikely to change the outcome of a decision. (*Id*. at 12-13.)

> [W]here the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision. The district court can, however, remand the case for further administrative proceedings in light of the evidence, if a claimant shows that the evidence is new and material, and that there was good cause for not presenting it in the prior proceeding."

*Cline v. Comm'r of Soc. Sec.,* 96 F.3d 146, 148–49 (6th Cir. 1996). "For the purposes of a 42 U.S.C. § 405(g) remand, evidence is new only if it was 'not in existence or available to the claimant at the time of the administrative proceeding.'" *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001), citing *Sullivan v. Finkelstein,* 496 U.S. 617, 626, 110 S.Ct. 2658, 110 L.Ed.2d 563 (1990). Such evidence is "material" only if there is "a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Id*., quoting *Sizemore v. Sec'y of Health & Human Servs.,* 865 F.2d 709, 711 (6th Cir.1988). "Good cause" is shown by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ. *Willis v. Sec'y of Health & Human Servs.,* 727 F.2d 551, 554 (1984) (per curiam). The burden of showing that a remand is appropriate is on the claimant. *Oliver v. Sec'y of Health & Human Servs.,* 804 F.2d 964, 966 (6th Cir.1986). *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).

There is no dispute that the evidence submitted it new, however, Tayse has not met her burden to show the evidence is material. Here, the Appeals Council reviewed the medical records to it and wrote the following when rejecting Tayse's request for review of the ALJ's decision:

> You submitted office treatment records from Cleveland Clinic Foundation, dated January 30, 2025 to April 16, 2025 (34 pages), a medical report from Cleveland Clinic, dated May 8, 2025 (2 pages), physical therapy records from Cleveland Clinic Rehabilitation and Sports Therapy, dated May 27, 2025 (9 pages), and a medical report from Cleveland Clinic, dated June 3, 2025 (3 pages). The Administrative Law Judge decided your case through August 12, 2024. This additional evidence does not relate to the period at issue. Therefore, it does not affect the decision about whether you were disabled beginning on or before August 12, 2024.
>
> If you want us to consider whether you were disabled after August 12, 2024, you need to apply again. If you file a new claim for disability insurance benefits within 6 months after you receive this letter, we can use September 24, 2024, the date of your request for review, as the date of your new claim. The date you file a new claim can make a difference in the amount of benefits we can pay.
>
> You have the right to file a new application at any time, but filing a new application is not the same as filing a civil action. If you disagree with our action and file a new application instead of filing a civil action, you might lose some benefits or not qualify for any benefits. So, if you disagree with our action, you should file a civil action within 60 days as described below.

(Tr. 2.) Tayse argues the new evidence shows worsening condition; however, the treatment note details symptoms arising five months before the ALJ's decision. Thus, it is unlikely the ALJ's decision would be different as the symptoms were considered and a diagnosis alone does not establish that a condition is disabling. *See Baker v. Colvin*, 2016 WL 4128435, at *13 (N.D. Ohio Aug. 3, 2016). The records concerning Tayse's shoulder pain show only conservative treatment in physical therapy and therefore it is unlikely this record would not have changed the outcome of the ALJ's decision especially considering the ALJ included additional limitations in his sedentary RFC. *See Alicia B. v. Comm'r of Soc. Sec.*, No. CV 25-10627, 2026 WL 575332, at *6 (E.D. Mich. Mar. 2, 2026) (ALJ did not err in considering conservative treatment at odds with imposing extreme limitations.) In the Sixth Circuit the Commissioner's decision "cannot be overturned

if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Substantial evidence supports the Commissioner's decision.

There is no error.

## VII. CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

Date: August 14, 2026

*s/ Jonathan Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**